**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHERINE JABLONSKI : <br> 927 Marilee Glen Court : <br> Durham, NC 27705 : <br>     and : <br> GISELLE VARGAS : <br> 58-47 197 Street : <br> Fresh Meadows, NY 11365 : <br> : <br>     Plaintiffs, : <br> : <br> v. : <br> : <br> W.B. MASON CO., INC. : <br> 59 Centre Street : <br> Brockton, MA 02303 : <br> : <br>     Defendant. : | **CLASS ACTION COMPLAINT** <br><br> Docket No.: _____ <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION – CIVIL ACTION COMPLAINT

Plaintiffs, Katherine Jablonski and Giselle Vargas (*hereinafter* referred collectively as "Plaintiffs"), by and through their undersigned counsel, hereby aver as follows on behalf of themselves and all similarly situated current or former employees:[1]

### I.  Introduction

1.      Plaintiffs have initiated this action, on behalf of themselves and all similarly situated current and/or former employees,[2] to redress violations by W.B. Mason Co. ("Defendant") of the New York Labor Laws, N.Y. Labor §§ 190, *et. seq*., for breach of contract, and for committing common-law fraud. Plaintiffs summarily allege herein that Defendant has

---

[1] The term "Plaintiffs" as used in this lawsuit is intended to and shall be interpreted as Katherine Jablonski, Giselle Vargas, and all similarly situated putative plaintiffs (who worked from or were deemed based anywhere within New York State for Defendant).

[2] This particular class action defines the class as those employees of Defendant whom were based in New York for Defendant WB, as discussed *ad nauseum infra*.

continually perpetuated a fraudulent, criminal, and unlawful payroll practices of **retroactively** reducing **earned** wages and commissions of Account Executives (who are salespeople), among other wage or commission violations.[3]

## II.   Parties & Jurisdiction

2.      The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

3.      Plaintiff Jablonski is an adult individual who resides at the above-captioned address. She is a citizen, domiciliary, and resident at the above-captioned address.

4.      Plaintiff Vargas is an adult individual who resides at the above-captioned address. She is a citizen, domiciliary, and resident at the above-captioned address.

5.      W.B. Mason Co., Inc. ("Defendant WB") is a corporation which has generally operated over the last several years with approximately 70 distribution centers, over 3,000 employees, and it generally manufactures, distributes and sells office supplies and related products all over the United States.[4]

6.      There is jurisdiction in this Court pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship, domiciliary status, and residency. By way of further elaboration:

- Defendant is a citizen, domiciliary, and resident exclusively of Massachusetts. It is headquartered <u>and</u> incorporated therein. Its executive management upon information and belief reside in this state as well, working from such location(s);

- Plaintiffs in this action exclusively worked in New York. And as explained *supra*, there is complete diversity of citizenship, domiciliary status, and residency;

---

[3] For notice purposes only, Plaintiffs inform Defendant that upon continuing investigation, principals and executives involved with violations alleged herein may be named through sought amendment (as to additional Defendant).

[4] Due to the COVID-19 pandemic, Defendant WB's overall internal workforce and operations have substantially changed. However, the summary herein is intended to outline Defendant WB's overall pre-pandemic generalized business operation(s).

- Plaintiffs are seeking an amount in controversy exponentially higher than $75,000.00, exclusive of costs and interest. By way of example or illustration only, there will be more than 100 plaintiffs in this action. Each Plaintiff is owed well in excess of $20,000.00 per Plaintiff, and Defendant is liable for liquidated damages and other penalties only totaling in excess of $1,500,000.00. Plaintiffs' anticipated fee petition for legal fees will well exceed $75,000.00 alone. These are only examples of damages sought and are conservatively stated for explanation of amount in controversy being readily established. Even if Plaintiffs did not meet the §1332 requirement for diversity jurisdiction (which they do), there would be jurisdiction under the Class Action Fairness Act ("CAFA" based upon the amount of damages at issue).

7.      At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

### III.      Factual Background

8.      The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

#### [A] *Information Specific to Named Class Plaintiffs*

9.      One of Defendant's primary office locations wherein it generated large sums of revenue was in New York City.

10.     Plaintiff Jablonski was exclusively employed for Defendant within New York State, and she worked for Defendant from mid-2012 through in or about September of 2020 (a period of approximately 8 years).

11.     Plaintiff Vargas was exclusively employed for Defendant within New York State, and she worked for Defendant from mid-2013 through in or about February of 2022 (a period of approximately 8-9 years).

12.     At all relevant times herein, all Plaintiffs were employed in the title of "Account Executive." Account Executives[5] for Defendant WB are salespeople who solicit new business and manage existing accounts within which to sell or distribute Defendant WB's products (to third-party commercial businesses and residences). Account Executives are hereinafter referred to and abbreviated singularly as "AE," or plural as "AEs."

13.     The AEs in this lawsuit were exclusively or primarily employed in New York throughout their tenures. All putative and actual Plaintiffs were: (a) based in New York City or other areas of New York; (b) managed by NY management; (c) responsible for a book of business in NY; and (d) participants in meetings and other responsibilities from NY offices of Defendant WB.

14.     All AEs in this lawsuit performed the same role, operated under the same commission structures, and were subject to the same nationwide (and NY-wide) policies and directives of Defendant WB. They were merely deemed based from different offices (or sales territories) throughout New York.

**[B] <u>Factual Allegations of Class-Wide Wage *and* Fraud Violations</u>**

15.     This is a Class Action (specific to New York AEs), limited to those AEs who have been based from and worked within New York (as outlined in significant detail *infra*).[6] All allegations in this lawsuit though represent a systemic and company-wide practice that is *uniformly* followed as to all AEs throughout the United States (not just in New York).

---

[5] For the purposes of this lawsuit, Account Executives as used herein shall only be construed to mean *commissioned* Account Executives. While far less frequent, Defendant has employed non-commissioned Account Executives.

[6] Because AEs are at times transferred to various locations but are subject to the same nationwide policies that form the bases of this lawsuit, this lawsuit also encompasses all AEs who primarily worked from NY even if transferred at varying times during their tenures.

16.     Employees (unlike within Defendant WB) who are hired in sales or commissions positions throughout the United States ***are universally*** provided with a documented commission plan which they may or may not be required to sign or execute in other fashion (but which defines ***in writing*** the commission expectations, terms and plan).

17.     In an effort to knowingly commit wage theft, fraud, and the intentional failure to pay earned commissions to AEs, Defendant WB (*during the 6-year lookback period from lawsuit filing*): (a) has and continues to willfully refuse to provide commission plans or specific documented commission structures/modifications to AEs in an effort to change commission entitlements <u>without notice</u> to AEs on a consistent and pervasive basis; and (b) ***retroactively*** implements changes ***after*** commissions ***have already been earned***.

18.     What Plaintiffs can and do earn by way of commissions are critical because such commissions generally constitute the primary source of Plaintiffs' income (as they predominantly cover any draw against such commissions or supplement minimum salary).[7]

19.     The ***only*** documents Plaintiffs receive are what is referred to as "commission statements." This is *part of the payroll process*. At the end of various months, Plaintiffs are informed in a commission statement what they earned by way of commissions ***for preceding timeframes***, generally at least a month or more. However, even these statements were not provided consistently or to all AEs.

20.     The commission statements (although they have changed over time due to other varying structures) generally (and as of most recent years) divide products into "Buckets" wherein each product sold by an AE is then subject to *a different* commission depending upon the Bucket in which it appears.

---

[7] In other words, commissions are generally most or all of each AEs income, not some tangential small incentive combined with substantial base pay.

21.     When AEs see the Commission Statement, they: (a) do what is best for their respective accounts; (b) sell all types of products; and (c) heavily and strenuously attempt to sell products *that of course offer the highest commissions* per their Commission Statements they receive. They rely upon the commission rate specified in the Commission Statement for what to sell and how much they will earn for a living.

22.     The crux of the unlawful scheme by Defendant though is that AEs sell substantial products based upon their understanding of the commission structure from their prior payroll (and Commission Statement), and then all AEs come to find out in a subsequent month that products (that they already sold) were moved to different buckets ***resulting in substantially lower commissions to them***. This is a primary example of the unlawful pay structure of Defendant, with many other examples to follow. Defendant blanketly change (***retroactively***) without legally-required notice to AEs their: (a) commission pay rates; (b) auto allowances; and (c) commission deductions (and summarily, compensation owed to AEs).

23.     After AEs work to heavily market and sell products generating high commissions, they only learn retroactively in their next payroll and commission statement that the percentages of such commissions were lowered upon payment. Defendant:

      (1) **DO NOT** provide Plaintiffs with any set commission plans on a long-term basis as do virtually all other companies *nationally*;[8]

      (2) Require Plaintiffs to rely upon each preceding Commission Statement **as an understanding** of what their commission structure is for selling in the coming month(s) prospectively;

      (3) Know that Plaintiffs live and generate an income solely upon their commissions;

      (4) **Retroactively lower** commissions *after* Plaintiffs perform work and sales relying upon prior commission statements as to commission structures; and

---

[8] All allegations in this complaint are related to considerations only within the statutory 6-year lookback period.

(5) **DO NOT** provide Plaintiffs with *legally required* notices, verbally or in writing, of reductions in commissions or changes to the commission structure (or buckets) from one commission statement to the next (as to the fraud outlined in this lawsuit).[9]

24.     To aid in better visualizing or understanding the unlawful <u>retroactive</u> commission changes that constitute an unlawful practice and policy companywide within Defendant, Plaintiffs illustrate what transpires monthly with just a few illustrations.[10]

### [1] <u>Illustration 1 – March 2018 to May of 2018 Commission Statements</u>

25.     "Exhibit A," attached hereto, is part of Defendant' companywide commission statement of how commissions were paid for March 2018 sales.[11] "Exhibit B," attached hereto, is a companywide commission statement excerpt of commissions paid for May 2018 sales.

26.     Exhibits A and B (excerpts from slightly longer commission statements) are examples of **the only** information AEs would receive about commissions *at all* during their entire periods of employment. Such information by Defendant was provided to AEs as part of the payroll process merely to show what AEs were to be paid in commissions.

27.     A comparison of Exhibits A and B would show that between March 2018 through May of 2018, AEs would sell products such as "Blizzard Water," "Data Storage," "HP Toner,"

---

[9] Defendant' payroll system is tantamount to having an hourly employee work on an hourly basis and getting paid at $14.00 per hour in 1 pay period (having the employee believe he will get paid that way in the next pay period based upon his payroll), paying $13.00 per hour in the second pay period, and $11.00 in the third pay period *with the hourly employee only finding out what he or she will be paid upon receipt of the next payroll after providing services under expectations from prior compensation offered*. Of course, Plaintiffs are not hourly herein. **But this is the very type of system Defendant unlawfully operates under**.

[10] Plaintiffs intentionally only provide examples from the same timeframes in the Spring of 2018, Spring of 2019, and Spring of 2020. All actions occurred continually, monthly, and pervasively (at varying times of the year). But using the same timeframe each further demonstrates *how consistent* the unlawful commission manipulation was within Defendant.

[11] The sales identified herein are specific to a different AE (than as named in this lawsuit). However, the commission percentages, buckets, and entire commission payout structure for the month *is uniform companywide to all AEs similarly situated to Plaintiffs*. Thus this example of an AE's commission statement is applicable to all AEs nationwide.

and "Keurig Brewer Products." Despite that these items had higher commissions represented in commission statements as of March 2018, *without notice* to AEs, the same products were placed in lower-commission generating buckets or simply were assigned lower commission percentages by May of 2018. As a result, Plaintiffs worked to sell products expecting one commission – but *without any notice* – were paid a lower commission rate **AFTER** having worked for 1-2 months based upon a different written commission structure that had been *retroactively* adjusted by Defendant.

28.     The aforesaid manipulation of commission percentages and entitlements to the detriment of AEs **continually** within Defendant, and Exhibits A and B are examples of a systemic and companywide unlawful practice of **retroactively** lessening earned commissions of AEs on a monthly basis throughout their employment with Defendant.

## [2]   Illustration 2 – March 2019 to May of 2019 Commission Statements

29.     "Exhibit C," attached hereto, is Defendant' companywide commission statement of how commissions were paid for March 2019 sales. "Exhibit D," attached hereto, is a companywide commission statement of commissions paid for April 2019 sales.[12] While percentages of commissions were adjusted in these Exhibits as well, the purpose of this illustration is to show *another form* of manipulation.

30.     At the <u>very bottom</u> of Exhibits C and D, such documentation demonstrates that:

(1) As of March 2019, AEs were working to earn commissions solely premised upon the "Grand Total % of Sales;"

(2) AEs worked very hard, sold thousands, hundreds of thousands, or millions of dollars' worth of products to Defendant' clientele; and

(3) After operating with the understanding anything AEs were to earn was solely upon the "Grand Total % of Sales" (pursuant to Exhibit C), when paid for past

---

[12] The commission statements are slightly longer, but Plaintiffs are providing a page as Exhibits for illustration.

sales in April of 2019 (Exhibit D), AEs had their overall commissions reduced by Defendant <u>retroactively</u> by the addition of a new "Growth and Volume Factor."

31.     This example of *new qualifying factors* (a "growth and volume factor" based reduction) reducing Plaintiffs' <u>already earned</u> commissions was done ***retroactively*** and without the knowledge of any AE until they obtain payment ***for past work***.

### [3] <u>Illustration 3 – Spring of 2020 to Summer of 2020</u>

32.     In the Spring of 2020, Defendant companywide encouraged AEs to sell personal protective equipment ("PPE"), cleaning, janitorial equipment, and sanitizer-related supplies (which were in high demand due to the pandemic). AEs nationwide were selling hundreds of thousands of dollars, and in some cases, millions of dollars in such supplies to accounts. Even when such went on back order due to supply exceeding demand during the COVID-19 pandemic, Plaintiffs continued to sell such equipment and supplies on backorder.

33.     By the time AEs <u>were paid</u> for such commissions (months later), the commissions shown to them in commission statements for such equipment / supplies had been so substantially reduced ***<u>retroactively</u>*** that some individual AEs were reduced in commissions individually by well in excess of $20,000.00 *just in that short timeframe*.[13]

### <u>Wage Fraud Purpose & Design</u>

34.     Defendant operate a commission system *unlike any other comparable business* in the United States for a specific reason – to steal and manipulate commissions enhancing overall revenue to the business and ownership.

---

[13] The violations as outlined by way of example in the Spring of 2020 are particularly egregious because: (a) Defendant engaged in unlawful price gouging; (b) substantially hiked prices on PPE and related supplies; and (c) <u>generated exceptionally high profit margins</u> prompting (out of sheer greed) the desire to unlawfully reduce compensation nationwide through *<u>a retroactive reduction</u>* of commission percentages as to such sales (to avoid salespeople from obtaining what they legally already earned).

35.     Whenever AEs as a whole focused on selling the highest-commission products instead of others to generate substantial income for themselves based upon prior commission statement percentages of commission specified, Defendant lowered the commissions without telling Plaintiffs to have less payroll obligations <u>and</u> to obtain the benefit of profit margin on continuing new orders from Plaintiffs' accounts.

36.     **<u>More drastic</u>** (and less surreptitious) retroactive changes to commissions of Plaintiffs occurred in the Spring of 2017, the summer of 2018, the spring of 2019, and in the spring / summer of 2020. Defendant WB's management ***have admitted*** to these drastic "retroactive" changes in commission numerous times to AEs internally.

37.     Defendant has even acknowledged changing costs in internal communications (by inflating them of products) just to reduce commissions of employees (such as the AEs).

38.     Defendant has an unlawful practice of lessening commissions of AEs because it decides to change or substitute products without prior warning, written policies, or other notice. This practice reduces a commission of an AE post-sale and reduces previously earned commissions in unrelated sales because of a monthly calculation on overall sale margins.

39.     AEs nationwide have been defrauded (as to unlawful commission practices) by 10s of millions of dollars by Defendant. As outlined below, Defendant also refused to share any data with AEs so they can conceal the scheme. New York Wage Laws require written plans to be disseminated and executed by commissioned salespeople. Yet, Defendants did not do this until June of 2021 as a result of other (previously-filed) litigation.

## Other types of Wage Fraud against AEs

40.     The above illustrations certainly comprise the crux of Defendant's unlawful nationwide commission scandal and scheme. However, Defendant's practices and policies nationwide of skimming and stealing commissions from AEs <u>also includes</u> but is not limited to:

(1) Defendant make donations to various clients and (upon information and belief) take tax deductions for the donations (attributable only to Defendant WB). Despite such donations being irrelevant to (and separate from) already established sales of Plaintiffs, ***Plaintiffs are reduced*** in their gross sales generation by Defendant' election to make such "donations." Defendant are thus falsely representing to third-party accounts they (as Defendant WB) are making donations while merely reducing the income of Plaintiffs.[14]

(2) Plaintiffs perform work selling on an account and working with various clients only to be told later by Defendant that the bid submitted by Defendant was so low that the account will at that time be treated as a non-commission account (causing Plaintiffs to have worked an account for no commission at all despite upwards of thousands to millions of dollars in such sales). Defendant' practices of claiming various accounts will be non-commission accounts after-the-fact is uniform throughout the United States.[15]

(3) Defendant set a "cost" price to AEs in commission statements that are used to calculate the profit generated by such AEs (for a commission payment). But Defendant **<u>do not list the correct, actual or real cost price</u>** of various products. Defendant use inflated cost prices in commission statements of such products to fraudulently reduce the overall commissions of AEs. Meanwhile, AEs see the same product(s) they sell to accounts being sold at an entirely different cost throughout the company or in different catalogues than as reflected in their commission statements (as what is specified in commission statements is ***falsely inflated*** to reduce commission entitlements); and

(4) Defendant knowingly reduce commissions of AEs by failing to properly calculate water deposits, rebate retention, calculating design time impermissibly, and in many other ways.

---

[14] There are no documents provided to Plaintiffs that authorize donation reductions in their income by Defendant, nor are Plaintiffs presented with any documentation to execute at anytime such donations are made that reduce their income.

[15] Plaintiffs do not consent to not being paid commissions on unilaterally noticed non-commission accounts by Defendant, nor have Plaintiffs ever been informed in writing of such standards or exclusions. Per Plaintiffs' commission statements, they are to be paid commissions regardless of Defendant' preferences or choice to offer better deals to certain accounts.

41.     All practices, policies, and directives within Defendant with respect to commission scamming against Plaintiffs are identical, uniform, and enforced by all branch management of Defendant against all Plaintiffs (at the direction of every individual Defendant to this lawsuit). Such policies are directly created and perpetuated by Defendant's executive management (as individually named in this lawsuit) throughout all branch locations in the United States. There are **numerous** other forms of unlawful commission practices which are also uniform, but this lawsuit is intended to provide broad notice of many such practices for notice purposes only. To provide an example of one of the more complex and intricate illegal practices by way of last example though:

(A) Defendant refers to most of what has been specified in this Complaint as transactional or IBM sales (which, per Defendant, are *primarily* the everyday transactions of products *they already warehouse*). However, Plaintiffs also engage in what Defendant refer to as Hedberg Sales, a/k/a Factory Direct Sales (which are products Plaintiffs sell to the account or client ordering such products that are shipped underlyingly directly from a third-party manufacturer to the client, as opposed to from Defendant WB). These Factory Direct Sales will be referred to herein as "Hedberg sales."

(B) Because Plaintiff's are advanced commissions when a sale is made on Hedberg sales, if payment by the account or client is not made in 60 days or 90 days from when payment obligations are supposed to start (**which is upon "underlyingly delivery"**), Defendant retroactively deducts 25% and then 75% respectively (totaling 100%) from commissions Plaintiffs are supposed to earn in the timeframe when such payment(s) are not made.

(C) However, Defendant uniformly defrauds their AEs in **2** separate ways with the aforesaid unlawful pay practice(s). All of Defendant's branch management are encouraged institutionally (and unethically) to "recognize" the income from the sale in the same month in which a Hedberg sale takes place to make the company's numbers look better (*even though* delivery was never made from the manufacturer to the client). But the retroactive deduction against Plaintiffs is only supposed to occur within 60 or 90 days *from "delivery"* of the Hedberg sale products.

(D) Because Defendant elects to inflate sales numbers *prior to delivery*, the 60 or 90 days per Defendant start running from when Defendant recognize the revenue (for purposes of Defendant "clawback" of commissions). The

problem is that delivery of the Hedberg sales products may not occur for weeks or months to the account or client. In turn, the payment obligations of the client or account had just started to run <u>or</u> passed by the time the clawback of commissions occur (explained in the hypothetical illustration below).

(E) Let's assume for example the following hypothetical (which is similar to what occurs consistently): (1) Plaintiffs sell Hedberg sales products; (2) Defendant rush to unethically recognize the revenue internally for accounting purposes; (3) Plaintiffs are paid commissions; (4) The manufacturer ships products (or furniture) *7 weeks after the order* to the account or client; (5) Defendant had already invoiced the client or account upon recognizing the revenue / sale triggering the 60 or 90 day clock ***7 weeks before*** delivery; (6) Defendant <u>and</u> the client or account know that payment obligations and timing of payment *only commence* upon "delivery;" (7) Defendant had nonetheless invoiced Defendant ***without any expectation of payment(s) just to claim recognition of the revenue at the detriment of AEs***; (8) Plaintiffs then have their commissions already paid deducted <u>solely because</u> the invoice was issued prematurely 7 weeks early and the client or account had not paid within 1 week of delivery (**which was not expected anyway**); and (9) as a result, a completely non-defaulting client or account that would naturally pay timely or properly, results in Plaintiffs having their commissions rescinded solely because Defendant uniformly and nationally invoice a client or account with no expectation of payment so prematurely.

(F) This practice is unlawful for many reasons. <u>First</u>, Defendant is unlawfully making a payroll deduction (by way of clawback) contrary to AEs understanding nationwide that they only face clawback of earned commission if accounts or clients fail to pay within 60 or 90 days from when payment obligations commence. <u>Second</u>, Plaintiffs understand that they are supposed to be given back the commissions already earned once the client or account does pay, even if after 60 or 90 days. But Defendant had ***no policy of tracking or automatically paying back*** Plaintiffs after clawback. Instead, Defendant put the burden on Plaintiffs to catch, notice, and immediately seek approval directly from executive management for return of such owed commissions. Hence, on a weekly basis Plaintiffs are not properly credited back their earned commissions because Defendant does not automatically return owed commissions (and many do not have the knowledge or ability to track such data). <u>Third</u>, when Plaintiffs are paid commissions initially, they are fully taxed in payroll. When Defendant deduct what they would pay from earnings, Plaintiffs are not credited back with such taxation for income they were no longer receiving. Then, in the event some ultra-sophisticated Plaintiffs do actually track and get approval for return of such rescinded commissions, they are paid again the same prior commission <u>subject to tax again in their next payroll</u>.

(G) Defendant's practices outlined in this example are illustrative of its exceedingly poor, manipulative, and fraudulent commission practices.

42.     In sum, Defendant basically determines what profit goals they desire to meet companywide and alter figures in commission statements towards all AEs on a uniform basis, even though illegal, to ensure such financial goals are met by defrauding all AEs nationwide. *The implementation and practices supra (and throughout this lawsuit)* _are applied in the exact same manner to every AE at every location of Defendant._

### Willful Intent to Conceal Calculations by Defendant

43.     Defendant refused to provide AEs with any documents or information in writing about: (a) a set commission "plan" within Defendant; (b) how commissions are calculated; (c) changes related to their commission plans; and (d) criteria specified in their commission statements. Requests across many states by AEs for this information has been denied or ignored.

44.     Defendant attempts to so strenuously conceal commission manipulation that when a 10-plus year AE demanded commission plan information that would benefit him in court proceedings **as to his own compensation** which is freely given to employees throughout the United States *in all other sales industries*, he was presented with a "Confidentiality And Non-Disclosure Agreement" ("NDA") by Defendant WB's Vice President of Human Resources requiring that in order for him to see his own compensation data, he would have to: (a) execute the NDA; (b) not disclose to anyone or other employees Defendant's own "compensation plan;" and (c) face "termination" if Defendant was not satisfied with Plaintiff's handling of the "compensation plan" that he and other AEs worked under and were paid by within Defendant.

45.     Defendant has had as a uniform practice and policy of refusing to share any compensation information with AEs *so that they are able to freely manipulate commission fraudulently* and in violation of wage laws. Despite ongoing assurances, Plaintiffs were never

provided with any documents as requested, nor a "package" explaining Defendant's commission structure as repeatedly promised.[16]

**Recorded Knowledge of Illegality and Admissions by Management**

46.     Many AEs nationwide have complained about retroactive commission reductions, improper commission calculations, and refusal to provide documentation to understand why Defendant retroactively change already earned commissions. However, one AE recorded a discussion in mid-2019 with high-level management.

47.     Eric Gervais has and remains a Regional Manager of Defendant WB **who directly reports to WB's high level executives operating this privately owned company**.

48.     During a *recorded* conversation in mid-2019, a Regional Manager communicated with an AE. During this conversation, the following dialogue took place:

>     *(i) **The AEs concerns**:*

- The AE stated: "I believe WB Mason is breaking the wage payment laws;"

- The AE stated that Defendant WB is "retroactively" changing commissions;

- The AE complained that: "These sales were already done" . . . "After the fact" . . . there is "changing of the compensation and then applying it to work that has already been done" . . . "That's not legal."

- The AE requested "12 months" of commission statements stating: "I have no information on these commission changes" and "I need hard facts of how this growth scale works and actual bucket system" and asked "What are the differences between the commission plan we were under before and now?"

>     *(ii) **Responses by Gervais:***

---

[16] For purposes of clarity, following many lawsuits filed in 3 states against Defendant, Defendant did from mid-2021 to mid-2022 seek to document and follow certain wage laws. But this lawsuit is for a 6-year-look back pre-attempts to change legal compliance and for violations still continuing that were not fully resolved by Defendant's attempt at minimal legal compliance in the last approximate year.

- "Masons can go in and essentially do whatever they want" . . . "the company has the right to pay it's salespeople however it wants."
- I cannot give you any documents about your compensation today, nor can you keep anything.

- WB plans to send all AEs a package explaining how commissions work (***but this was false***, as nothing was ever provided to any AE following this recorded conversation).

- <u>Defendant WB can retroactively change your pay if it wants</u>.

- "I am not saying I agree with the way it's communicated" . . . the company may be under "financial stress."

- "It if was up to me, I would of said on next statement this is the way we are paying you" . . . "I expressed that to everyone at the company."

- But they checked with their lawyers and they can even change my salary for time I worked in the past retroactively.

49.    Gervais acknowledged that executive **ownership** of Defendant was aware: (1) of allegations of illegality; (2) that Defendant as a whole claims it can retroactively change commissions of AEs; (3) that the practices as outlined in this lawsuit are companywide; and (4) that all decision making concerning commissions is central and decided by Defendant WB's executives.

50.    In a recorded conversation between an AE, Iannaccone (Sales Manager), Cristina Hall (Branch Manager), and Gervais (Regional Manager) [collectively "management"] ***in late 2019***, such management: (a) admitted to problems companywide; (b) admitted rules are changed retroactively; (c) acknowledged concerns of illegality, smoke and mirrors, and concerns with retroactive commission changes; (d) *explained the company has to do what it has to do to financially survive in a tough and competitive industry*; (e) told the recording AE his complaints of commission violations are "disruptive," referred to him as a "jerk" for raising such complaints, and they discouraged him from getting a lawyer, threatened that if ownership knew

he consulted a lawyer he may have serious problems, and told the AE if he doesn't like the commissions system changing at times to find another job. ***When the recording employee point-blank repeated that commissions are changed "retroactively," such management said <u>he was "correct</u>."***

### The Commissions Process and Decision Makers

51.     Defendant's ownership are corporate officers and/or owners who have established, perpetuated, and condoned the companywide unlawful payroll scheme. They have created a plan to avoid ongoing complaints through deflection <u>and</u> prohibited communication from AEs with those having knowledge of the commission manipulation.

52.     Defendant's owners and executives required all commission calculations to be processed through Tonya Nunnelly ("Nunnelly"). All AEs <u>are strictly prohibited</u> from communicating with Nunnelly **<u>or</u>** executive management (or with other commission management such as Kathy Bessette). Thus, AEs are not permitted to communicate with anyone who actually engages in the commission decision making or processing of commissions; they are strictly encouraged to raise such issues with their immediate manager(s).

53.     When AEs complained to local and regional management, they are only told by such management that they have nothing to do with processing, changing, establishing, or handling commissions. AEs are promised at some point in the future documentation will be shared, but such information is **<u>never</u>** disseminated or forthcoming.

54.     Where AEs attempted to complain to the highest levels of Human Resources Management, such as Defendant's executive management: (a) AEs are stonewalled; (b) lied to; (c) presented with an NDA threatening potential termination; and/or (d) instructed they face liability if they communicate with colleagues. Defendant's actions as a whole are atrocious.

55.     These individuals have established the aforesaid *nationwide practice* that is *uniform* and handled in the same manner with every AE *in the entire company*, including throughout New York.

### Defendant has indefensibly violated applicable laws

56.     When Plaintiffs received a commission statement reflecting a commission rate, they relied to their detriment that this would be the manner in which they were paid in the subsequent commission statement. This did not happen.

57.     Plaintiffs received commission statements reflecting payroll for lesser commission rates than existed ***at the time such Plaintiffs performed the actual labor***. Pursuant to NY Labor Law §§ 190 ("the Labor Law"), Defendant has violated the Labor Law in numerous ways.

58.     Under § 190, "Wages" are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, **commission** or other basis." Hence, all commissions earned by Plaintiffs during their employ with Defendant were "wages" governed by § 190.

59.     Under § 191, "commissioned salespersons" **are required** to be: (1) provided with a commission plan "**reduced to writing**, *signed by both the employer and the commission salesperson*, kept on file by the employer for a period of not less than three years and made available" . . . "upon request." Defendant **made no effort** whatsoever to comply with this statutory mandate, refused to provide commission plans, **never** had commission plans executed, and ***intentionally avoided such statutory obligations to manipulate commission pay***. *See also* §191-b (same).

60.     Under § 191-a, "commissions" due to Plaintiffs included any "commission due for services" according to the terms of any applicable agreement. Each month, Plaintiffs worked under a set of commission rates believing they would govern the services they performed. Then, without notice, such commission rates changed only upon payment. **This is *per se* unlawful**.

61.     Additionally, commissioned salespeople had improper deductions taken in their compensation (and commission structure) by and through "donations" made by Defendant, clawback of monies for alleged non-payment(s) timely by third parties, and in other ways. This was *per se* unlawful. Under § 193, **no deduction** from earned commissions is legally permitted by Defendant unless "expressly authorized *in writing* by the employee **and** are for the benefit of the employee." Defendant intentionally refused to document anything or abide by statutory requirements in New York.

62.     Defendant *retroactively reduced earned commissions **without notice*** to Plaintiffs on a consistent basis during their tenures. Pursuant to § 193, whenever changes are made to pay or benefits, "the employer shall, as soon as practicable, but in each case before any increased deduction is made on the employee's behalf, **notify the employee *prior to* the implementation of the change**." Plaintiffs were only notified after changes to their compensation were being made. And such changes were required to be notified **in writing** prior to implementation, which never occurred. *See* § 193(b).

63.     And finally, Defendant so pervasively violated Labor Laws in New York, they completely refused to even comply with § 195 of the Labor Law. In particular, Defendant were **statutorily required** to:

> (1) "Provide . . . employees" . . . "in writing" . . . "a notice containing the following information: the rate or rates of pay and basis thereof;"

(2) "Obtain from the employee a signed and dated written acknowledgement" of Defendant's "notice" of pay structure;

(3) "Notify his or her employees **in writing** of any changes to the information" related to pay "**at least seven calendar days prior the time of such changes**;" and

(4) Retain all signed and executed acknowledgement of employee compensation structures and new notices executed by employees of any changes **for no less than six years**.

64.     Employers throughout New York provide written commission plans to be executed by employees, and they have employees execute and authorize any changes in advance of implementing any changes in a commission structure.

65.     Defendant on the other hand made **no objective effort** to comply with any aspects of NY State Law(s). Defendant **had a practice where they never** had employees sign commission plans, nor receive any written notices of changes, sign any new policies on commission changes, and they blanketly changed whatever they wanted retroactively. Defendant' entire payroll scheme is illegal throughout New York.

66.     Under § 191-c, when a commissioned salesperson is not properly paid all owed commissions, that commissioned salesperson "shall" be automatically entitled to "double damages," "attorney's fees," "court costs," and "disbursements." This of course is in addition to other penalties available (such as $50 per-day notice violations), which have been capped at $5,000.00 per person (and per violation). Plaintiffs seek every available legal remedy in this class action.

67.     New Jersey's wage laws are very similar to that of New York (also requiring "notice" prior to any change of commission structures). In *Winslow v. Corp. Exp., Inc*., 364 N.J. Super. 128, 141, 834 A.2d 1037, 1045 (App. Div. 2003), the Court addressed a very similar fact pattern (relative to a class action involving salespeople) as set forth in this lawsuit. Therein, the

Appellate Division held that **any** changes to an employee's commission structure without notice prior to payment will constitute a violation of wage payment or labor law. Moreover, the Court explained (*just as in this case*), efforts to conceal the payment process amply demonstrated not only breach of contract but also "common law fraud."[17]

68.     In New York, the statute of limitations (or look-back period) for wage violations under the Labor Law is **6 years** from date of lawsuit filing. *See* § 198(3).

69.     Plaintiffs are entitled to unpaid wages, liquidated damages, attorney's fees, interest, costs, and other applicable damages.

### Class Action Applicability & Class Parameters

70.     The legal theory of this class action is extremely narrow. They are as follows:

(1) This class action consists solely of Account Executives who were commissioned and who were either primarily based in or working from New York for Defendant (even if transferred for small aspects of their tenure(s)).

(2) This class action consists of a discrete timeframe, a 6-year look-back time period from date of filing of this lawsuit.

(3) This class action presents a very narrow legal theory asserting that Defendant utilized a systemic practice and policy that was uniform companywide of illegally and fraudulently reducing commissions of employees through a companywide business practice (as explained in detail *throughout this lawsuit*). Thus, the claims and defenses will be identical in every respect to all class members.

71.     There is *no question* that a class action is the appropriate means to resolve this type of case and underlying allegations, as:

- Pursuant to Fed.R.Civ.P. 23(a)(1) the class is so numerous that joinder of all members is impracticable. At any given time, Defendant employed well over 100

---

[17] The NJ jurisprudence is provided herein because it is so identical to the current fact pattern. And NY jurisprudence also supports the same interpretation of that of *Winslow*. *See e.g. Perelli v. Liberty Mut. Ins. Co., 2013 NY Slip Op 30454(U), ¶ 4* (Sup. Ct. 2013)(commissions cannot be retroactively impacted by any payroll changes); *Garcia v. Chirping Chicken NYC, Inc.*, 2016 U.S. Dist. LEXIS 32750, at *28 (E.D.N.Y. 2016)(explaining the very taxing obligations of notice by an employer under the NY Labor Law prior to any changes in payroll structures).

AEs based in New York; and over a 6-year lookback, it is expected that well in excess of 100 class members will have been impacted.

- Pursuant to Fed.R.Civ.P. 23(a)(2), the same questions of fact and law are common and typical of the entire class. The sole question in this case is whether or not Defendant's companywide policies (uniformly enforced as to its AEs) resulted in unlawfully withheld or retroactively reduced commissions.

- Pursuant to Fed.R.Civ.P. 23(a)(3), the claims and defenses will be the same as to all Parties. Defendant will likely contest a uniform practice whereas all Plaintiffs' legal claims hinge on establishing such an unlawful practice.

- Pursuant to Fed.R.Civ.P. 23(a)(4), the representatives are a good cross-section of long-term (many-year) employees who will fairly and adequately represent the interests of the class.

- Pursuant to Rule 23, a class action is an appropriate vehicle for resolution of this case because there is a risk of over 100 inconsistent or varying adjudications, a high risk of inefficiency and waste of party or judicial resources, and no interests could be impeded by class adjudication.

## Count I
## Violations of New York Labor Law (at §§ 190 *et. seq.*)
### (Failure to properly pay earned commissions)

72. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

73. Plaintiffs and all similarly situated employees assert they are owed "wages," a term that is inclusive of "commissions."

74. Defendant has engaged in uniform and undeniable nationwide practices that are unlawful. Class-wide violations of the Labor Law have taken place as fully outlined throughout this lawsuit, and Plaintiffs seek all available relief for such violations.

## Count II
## Breach of Contract
### (Failure to properly pay earned commissions)

75. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

76.     Each and every time Plaintiffs received a commission statement, set commission rates were specified. Plaintiffs operated under the promise of receipt of such commissions.

77.     Without notice, Plaintiffs received less commissions than assured in preceding commission statement (after having already performed work).

78.     These actions, in addition to constituting Labor Law violations, also constitute breach of contract.

**Count III**
**Common Law Fraud**
**(Failure to properly pay earned commissions)**

79.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

80.     There is simply no doubt that Defendant has engaged in a nationwide scandal and scheme of defrauding AEs by *inter alia*:

> (1) Having AEs rely upon set commission structures in commission statements;
>
> (2) Changing the pay structure after AEs performed work and sales to lessen and reduce commissions;
>
> (3) Falsely adjusting commissions owed through many other means as outlined in this lawsuit; and
>
> (4) By creating a national scheme to evade complaints, inquiries or to provide any details to inquiring or complaining AEs.

**Count IV**
**Unjust Enrichment**
**(Failure to properly pay earned commissions)**

81.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

82. Plaintiffs all worked to their detriment expecting set commissions and compensation. Defendant should be disgorged of their ill-retained benefits of work performed by AEs.

83. This claim is specifically pleaded in the alternative as an equitable claim in the event that any legal claim cannot – for any reason – be established.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of defrauding commissioned Account Executives and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B. Defendant is to compensate Plaintiffs (and all similarly situated AEs) for all compensation to which they have been deprived in the last 6 years dating back from the filing of this lawsuit;

C. Plaintiffs (and all similarly situated AEs) are to be awarded liquidated, punitive, or other penalty damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendant for willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiffs are to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate;

E. Plaintiffs are to be awarded the costs and expenses of this action and reasonable legal fees;

F. Any verdict in favor of Plaintiffs is to be molded by the Court to maximize the financial recovery available to the Plaintiffs; and

G.   Plaintiffs are to receive a trial by jury.


Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**


*/s/ Adam C. Lease*
Adam C. Lease, Esquire
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801
*Attorneys for Plaintiff*


Dated: June 3, 2022